Good morning, Your Honor. May it please the Court, my name is H. Glenn Fogel, Jr. I'm the attorney for Patrick Anthony Prince, also known as Troy Taffara Williams. I'd like to reserve maybe a minute or two minutes for rebuttal, but we'll see what the Court wishes to ask me about. Ten minutes is not a lot of time to do here, but what I would like to point out to the Court is the evidence that's in the record here. The evidence is not just the testimony of the petitioner. There's also documentary evidence. There's evidence of country reports. So what I'd like to point out that we have in the record that actually supports my client's claim is that there's a country report showing numerous police killings and only one police officer ever prosecuted for an unlawful killing, which clearly shows an appearance and the reality of impunity with police officers in Jamaica, killing, you know, killing supposed suspects. The only that there's political tribalism. You what? Forgive me for interrupting, but your claim is what? That your claim was yes. Well, there's two claims. Okay. The first claim is withholding of removal, and that my client was persecuted on account of his imputed political opinion and his membership in the Williams family as his father was a supporter of former Prime Minister Manley. But both of those are claims of persecution on account of political opinion. Well, there's past persecution for political opinion, but also as a member of the Williams family. As a social group? Yeah, that's a particular social group. Her family is clearly a particular social group. Okay. And that's one of the things the immigration judge nor the Board of Immigration Appeals even looked at. They didn't even consider it at all. In fact, the board's decision merely just basically says that the judge's decision was right. And what's the problem with the judge's decision? It doesn't make any legal analysis of the withholding claim or the cat claim. It just kind of rambles through the testimony of the petitioner and then concludes that, well, because maybe his father was a gang member and then all of this happened was due to gang violence and, you know, there's no – and that's it. And that's basically what it says. But he didn't say that he didn't believe the petitioner. And, in fact, so the presumption – there's a presumption of credibility. But there's also some other evidence in the record that I think is very telling, particularly that his cousin, Sheldon Williams, was killed by the police. There's an article about that that's in the record, and we have the death certificate as well. There's two of respondents' brothers were killed by the police, and he was also, you know, attacked because of his imputed political – or at least either imputed political opinion. In fact, the first time that this happened to him was when he was 9 years old, and he was kidnapped and put in the car and set on fire. I mean, that to me is clearly past persecution. He was 9 years old and couldn't obviously, you know, give the same account as an adult, but he did say that it was because of his father, and they said that his father had to die and because of the political opinion. But where is the evidence in the record that there's a nexus between the past harm and potential future harm in the political activities of either the petitioner or his father? Well, okay, so here's the nexus. If you believe the respondent, the nexus is because of his father's political activities. So that's – and the harm – and what they said to him when he was attacked, when he was attacked even when he was 9, they said it was because of his father. His father needed to stop his political activities, and he needed to die. And what was his father's political activities other than being friends, I think, with Mr. – with the head of the PNP? Well, I don't – you know, he wasn't able to articulate that, you know, that specifically, but he said he was a supporter and always had been a supporter. And even in – even the articles that were submitted showed that the area that he was from was the former area that, you know, the Prime Minister's – I mean, the former Prime Minister's past. But that was his – that was his political area. I mean, that was his area as a member of Parliament. I'm sorry. He was supported by the neighborhoods and wherever – where they lived. But he wasn't able to specifically, you know, say that he campaigned for him. He said he knew him. He said he always supported him. That was his – you know, that was the only thing in the record. This is the father. Correct, the father. When you say he, are you referring to the petitioner or the father? The father. The father. But everything that happened to the son was always because of the father. So even if it's not political, it's because of his membership in, you know, in his father's family because he's his father's son. I don't recall reading in the opening brief that the protected status here is the membership in his family. It's political activity, I thought. Did you read that issue somehow? It's primarily – I mean, it's primarily political activity, but also because of his family. And we mentioned several times because of his relationship to his father, which is – which is – it's really – it's really both. But isn't there substantial evidence in the record that there was a turf war and the father was head of this rival – of this purported gang? There's nothing to say that the father was head of the gang. There's just a mention that he was supposedly in a gang back in the 1960s. I mean, that's – you know, over this – I mean, that's what that is. But he – but, you know, he always said that his father supported the PNP. And then there's also evidence in the record that everybody from that neighborhood, Tel Aviv, I believe is where he said he was from, is also supported manly. And then there was political infighting amongst the groups. And there's another – you know, one of the other articles talks about the tribalism and infighting between the groups that was – even though they supported the same party. I have a question about a period of time that was not mentioned in the briefs, and that is between, I think, approximately 2002 or 2003. This was when the petitioner was living with an individual named Mark. Right. And he said he was shot at, so he left that individual's house. And then there was no other alleged incidents until he was shot at in 2006. So what happened during that four-year period of time? He was living in Jamaica. I – he said – I mean, based on what I can tell, and again, I didn't represent him at the – with the immigration judge. He was on the street. And he said he was hiding on the street and, you know, trying to stay out – you know, trying to survive, I assume. But it seems like the absence of any incidents during the four- or five-year period of time supports the immigration judge and subsequently the BIA's finding that there was no – well, there was no violence perpetrated against him because of his political connection. Well, he was able to – and that's a very good point, Your Honor. He was able to leave. He was able to leave, but he said he left because he was afraid for his life. After he left, his cousin was killed. And I think that's a – you know, that's a thing. And the other thing is if he was persecuted in the past, you know, there's a presumption of future persecution. And the government has to rebut that. Does he have family members living there now? No. I don't think he has anybody living there. And I'm – When did his – when did his father die? I believe his father died in 2000, right when he was here in the United States before he was deported the first time. Do you want to reserve the rest of your time? I'll just reserve – yeah, I'll reserve a few minutes. Thank you. You have about a minute and a half. We'll hear from the government. Thank you. You may proceed. Good morning, Your Honor. First, may it please the Court, Giovanni DiMaggio on behalf of the United States. Your Honors, if there's only one thing that you take away from our discussion this morning, it should be that the agency's job is to make sense of it all. And substantial evidence supports the agency's making sense of petitioners' generally credible but otherwise confusing and unpersuasive testimony by finding that any past and likely future persecution was and would be based on ongoing gang violence in Kingston, Jamaica, and not based on, as he claims, his father's political affiliation or any other statutorily protected ground. And I will pause here briefly just to note that to the extent Petitioner today raises for the first time a claim based on a particular social group, as I think Your Honors acknowledge and you're questioning, that claim is at least waived inasmuch as it's not addressed in his – in opening brief. And I believe it would not have been exhausted as it was not raised below. So returning to the first point, Your Honor, here the IJ went through – and I'm reading from page – or referring to page 51 of the IJ's decision in the record. He went through Petitioner's testimony quite carefully to see if he could make any sense of Petitioner's claim in light of a shift in his testimony from fearing only the JLP to also fearing the PNP, who apparently shot Petitioner's father, which would have meant they shot a member of their own party. The key to making sense of it all for the agency here was Petitioner's own Exhibit 7, from which the IJ and the Board reasonably deduced that this is actually about the unfortunate circumstance that Petitioner was raised by a gang member in an impoverished gangland environment of indiscriminate violence, to paraphrase from pages 51 through 53 of the record. And indeed, on page 52, the immigration judge elaborated that this deduction was based on a record which was devoid of documentation of Petitioner's father's political activity. And the only article supporting his father's existence, the immigration judge noted, establishes rather than that he was politically active, that he was a member of a gang and he had an alias to the effect of Dixie Boy. That's on page 282 of the administrative record. And furthermore, that his father was part of a violent, vicious, and indiscriminate gang war among central Kingston neighborhoods, which I'll note for the Court, as other parts of Exhibit 7 reflect, these gang wars are mainly, in fact, gang-related and not about politics, as most of the entire central Kingston region historically votes PNP. So this is intra-PNP fighting here. But in terms of the claim under the Convention Against Torture, there's certainly evidence that there was police involvement in some of the killings, including, I think, Petitioner's brothers and his cousin? Well, Your Honor, actually, even acknowledging that there may have been evidence, certainly vis-à-vis the Petitioner's testimony that the police were killing either indiscriminately or because of some political motivation his family, that is rebutted by the record evidence that shows, just to walk through those instances, there was the shooting of Petitioner's older brother, Clive Williams. He claimed that he was shot by police, but he even clarified himself that he was shot by police because they thought he was a thief. Also there was the killing of his half-brother, Winston Kelly, which he acknowledged himself as well, was in the context of the police searching for someone else and was in a fortunate circumstance of his half-brother being in the wrong place at the wrong time, when, in fact, the police were chasing another individual. And then you have the shooting of his cousin, Sheldon Williams, who was killed by police. He says, Petitioner says, because of political views, but if you look at the record, in particular Petitioner's own Exhibit 7, at record page 279, we have an article here clarifying that Petitioner's cousin was with a group of people who had opened fire on the police, and then the police returned fire. So that was the context of that shooting. And I'll also note, Your Honor, that to the contrary of any suggestion Petitioner makes that the police or the government in Jamaica is acquiescing in or participating in torture, as it relates to his claim, especially the gang violence and the PNP political opinion, the record indicates to the contrary. It not only indicates that the fighting is not politically based, but rather gang-based, but also on page 285 of the record it notes that in a 2013 article, which is rather recent, that the police are actually increasing their efforts to curtail bloodshed. And as Your Honors know well, this Court has announced in many opinions, not least of which would be Garcia Millon, which we cite in our brief, that the government does not acquiesce merely because it is aware of torture, but ineffective in or powerless to stop it. And certainly that's what we have here, where we have evidence indicating that the police, if anything, is ramping up its efforts to try to curtail the violence. Do you understand his position to have been, before the Board and the IJ, that his torture claim is based upon his political opinion as well as his withholding claim? I understand them certainly to overlap, although he doesn't need to show some kind of basis. He doesn't need to show that. Right. He just needs to show that there's a likelihood that he would be tortured by or with the acquiescence of government forces in Jamaica. And to the extent that he attempts to satisfy that burden, the immigration judge reasonably deduced that actually that's not the case, in light of the record evidence that I just pointed to, Your Honors. What about the last incident where he was shot at by police before he fled the country? Which incident are you referring to? I thought Petitioner alleged that he was shot at by police in 2006, and that's what led him to leave and depart from Mexico? Well, I have a reference here. I don't recall who allegedly shot at him in 2006. I do note that he testified to that effect on I think it's record page 191. I don't see him specifying. I don't recall if it was a police officer who shot at him, so I can look at that. Well, to the extent he generally testifies to the effect that he was shot at, I mean, this just, again, falls under the umbrella. I take it if it's random violence, he doesn't get any place. That's correct, Your Honor. And as the immigration judge, again, reasonably deduced, everything happening here is based on the unfortunate circumstance of the ongoing violence, gang-based violence in Kingston, Jamaica. For those reasons, Your Honor, again, the agency's determination that any past and likely future persecution was and would be based on this gang violence and not on his father's political affiliation is supported by substantial evidence, as is the agency's determination that Petitioner would not be tortured by or with acquiescence of government officials. And if Your Honors have no further questions, the government. Judge Gould, do you have any further questions? No questions here. Thank you. Thank you. Your Honors, in that case, the government, for those reasons and for the reasons stated in its brief, requests that the court deny the petition. Thank you. Thank you. Thank you, Your Honors. Just briefly, what the government said, that he was with a group of the — that was the police version. The eyewitnesses, I'm looking at the article, the eyewitnesses at the scene that said that that's not true, that he ran away from the police and the police — William saw the police patrol and ran. He was chased and shot. They said that he ran because he had a bag of cocaine or something. But he just ran and turned and ran. So that's not — there's a lot of dispute. And even the country report says that every time there's a police shooting, the police generally claim that somebody shot at them, so they shot them back. And that's just the sort of modus operandi of what happens in Jamaica. And the report that we have, I think it's the 2013 report, said over 200 people were killed by the police during that year. Jamaica is a small country. I think it's 3 million people. That's a lot of people killed by the police. And no one was ever prosecuted for it. And if his cousin was shot by the police, his brother was shot. Both of his brothers were shot by the police. There appears to be, even if you're looking at the CAC claim, there clearly appears to be a very well-founded fear and probability there. But on that theory, they should never send anybody back to Jamaica. And these aren't government actors. The police are government actors. That's what they are. So thank you very much for allowing me to speak on it. Thank you. Thank you. The case just argued is submitted for decision. We thank counsel for their arguments. We'll hear the next case, which is United States v. Harris.
judges: Schroeder, Gould, Du